I'm Robert Jobin. I'm appearing today on behalf of the petitioner Gersharin Kaur. Although the immigration judge made an adverse credibility finding in this case, she recognized that Ms. Kaur's in-court testimony had been internally consistent, entirely consistent with her detailed written asylum application, and she was unable to point to any discrepancies between her in-court testimony and her corroborating documents. Because Ms. Kaur had been otherwise perfectly consistent, the immigration judge based her adverse credibility finding entirely on inconsistent statements that Ms. Kaur allegedly gave to an asylum officer. Although the asylum officer testified, she admitted twice that she had no independent recollection of Ms. Kaur and no independent recollection of her interview. Doesn't that all go to the credibility determination that the I.J. makes of Mrs. Kaufman or Ms. Kaufman when she testifies? I mean, here there were – it doesn't make any difference where she was inconsistent, whether she was inconsistent at the hearing or she was inconsistent at the asylum interview, does it? I don't think that makes a difference. The issue really is whether – is the reliability of the notes and Ms. Kaufman's testimony. Because Ms. Kaufman, she testified again that she has no independent recollection of what went down at the interview. She testified – That's not unusual. I mean, these people see hundreds of people during the year. They take detailed notes and – That's exactly right. But I guess my point, Your Honor, is because she has no independent recollection of what went down in her testimony is really just an attempt to reconstruct what occurred at the interview. It's the notes that we're primarily concerned with. Right. That's my point. I don't think her testimony adds much to the notes because, again, she testified that she didn't remember the interview, and she's basing her testimony, it seems, almost entirely on the notes. So what you're saying is that if the notes show substantial evidence of inconsistency, it goes ill for your client. But if they don't, it goes well. I agree with that. I think that's right. So ultimately, I think the issue in the case is whether the notes have enough indicia of reliability to constitute substantial evidence. And, you know, the judge pointed to supposedly eight inconsistencies between what was supposedly said at the asylum interview and what was said in court. Six of those go to dates. Two – only two of them are more substantive than that. And I want to focus on the two. And the first one I want to focus on – the first one I want to focus on is what seems to be the big one. And that's about the rape. And this is in the notes at pages 333 and 334. Because based on the notes, the immigration judge concluded that Ms. Cower, at her interview, had suggested that she had been raped in her second arrest rather than her first arrest. And, again, the issue here is the reliability of the notes. You look at these notes on pages 333 and 334. At the top there, it says, you know, my second arrest was April 16th, 1999. First arrest was January 5th. And we know she was arrested January 5th, 1997. Then there's this – a narrative of what took place when following one of these arrests during which she was supposedly raped. But there's no question. We don't know what question was asked and what question she's answering as she begins this narrative. And I think that's very important. It begins by saying, you know, first, me and my brother were together. And that might suggest that she's talking about the second arrest because she and her brother were arrested together during the second arrest. But then again, you know, during her first arrest, she was arrested at home at 8 o'clock in the morning. Her brother at the time of the first arrest was 14 or 16 years old. So, you know, it's entirely possible that she's talking about we were together when the police came in January of 1997. Then we were separated. Well, it just begs the question, were you separated when you were taken from the home and your brother was left behind? Or were you separated at the police station? We don't know because we don't know what question she's responding to. She goes on to say, I was put in a room where the inspector mistreated me. I was there for six hours. And then she recounts essentially the facts of her first arrest, what happened during her first arrest. And the immigration judge sort of assumed that this was all about the second arrest and there was some confusion at the asylum interview. There's really no substantial basis for coming to that conclusion because we don't know what questions she's being asked. You know, this carries down onto page 334 and toward the middle of the page there. You see where it says he raped, kicked, and slapped me? It's hard to make some of these notes out. And then below that it says cops didn't hit me. And the asylum officer saw this as a discrepancy because in the first arrest she indicated that the policeman didn't beat her. But, again, it just sort of begs the question. She indicated in her second arrest the police didn't beat her. But, again, it just begs the question, which arrest are we talking about? Because if Ms. Cower is talking about her first arrest, which is what we think she's talking about, it's true. The police officers didn't beat her. Only the inspector beat her. So, you know, with respect to the big inconsistency here, what, you know, the immigration judge saw as the central one, there's not substantial evidence here to support it because we don't know what arrest was being asked about here because we don't know what questions were being asked along the way. But, in fact, if you look at this narrative, there's not a single question noted in the narrative. Not one. So we don't know what questions are being asked along the way. But my notes indicate that 292, 293 of the record, she was asked whether she was raped at the second arrest, and she answered yes. Can you just tell me what line you're looking at, Your Honor? I don't have the transcript here. I just have my notes. Because when I read the testimony, her testimony, it's not at all clear which arrest she's talking about. That's your point. You don't know which arrest. Yeah. It says, you know, I asked her about the discrepancy between her declaration and her testimony, but nowhere in her testimony does the asylum officer even make clear that she's definitively speaking of the second arrest. But whatever, even if that were true, she's basing her testimony entirely on the notes. And, again, the interview occurred three years before. She testified that she'd interviewed some 10,000 people. She testified that she doesn't have any recollection, independent recollection. She's trying to reconstruct. I heard that from you before. Yeah. The second issue here is this issue about whether she ever returned home after she went into hiding in 1999. And if you look at page 323, this is the asylum officer's assessment to refer. One, two, three, four, five, six paragraphs down. I'm sorry. Which page? 323, Your Honor. 323. She says she only returned home once in September 1999 because her mother was ill. Well, that comes from page 329 of the notes. And 329 says, I lived in Delhi, didn't go back except once in September 1999. Well, again, it sort of begs the question because we don't know what question she's responding to. If the question was the question, did you return home, well, if so, this is substantial evidence, arguably. But if the question is, did you return to Punjab, that's a different matter. We don't know what question she was responding to, and her notes don't say she went back home. That's only in the assessment to refer. You know, again, there's not substantial evidence. The notes are not sufficiently reliable on this point for us to make any sort of inference. The other inconsistencies, they all relate to dates, every single one of them. And what's important about that, and I think what's dispositive about that, is that the asylum officer testified she doesn't speak Punjabi. She's never been trained in Punjabi, but she did say she fancies herself as something of a linguist. And she says that after doing this for six years, she's learned to pick up words here and there. And on page 299 of the record, she was asked, because, you know, it's not the first time we've had this asylum officer. We know how she operates. And we asked, do you sometimes listen to the applicant in Punjabi on a given date, for example, and jot it down based on your understanding of Punjabi? She says, no, I wait for the translation, and then she corrects herself. And she says, actually, that's not correct. Sometimes I will. I will write something down, like if they say, and she gives an untranslated number in Punjabi, or January, and she gives a, you know, starts speaking in Punjabi supposedly, it's pretty obvious that they're saying the 4th of January. The bottom line is here, she admits in her testimony that at least with respect to dates, even though she's never been trained in Punjabi, she makes notes based on her understanding of what's being said without waiting for the translation. That alone is enough to undermine the reliability of these notes. Even if the notes were reliable with respect to dates, and I don't think they are, obviously the law in this circuit is that generally discrepancies with respect to dates are not significant enough, generally not significant enough to undermine credibility. But especially when you have an asylum officer who's jotting down notes based on her minimal understanding of what those dates might be. I'll reserve the balance. Thank you. Good morning, Your Honor. Good morning. May it please the Court. Jem Sponzo on behalf of the Respondent. The record before this Court simply does not compel reversal of the agency's determination that Petitioner failed to prove her identity, let alone her eligibility for asylum, withholding of removal or protection under the regulations implementing the Convention Against Torture. In the absence of any evidence that would compel reversal of the agent's adverse credibility finding and result in denial of Petitioner's applications for relief, this Court must deny the petition for review. First and foremost, Petitioner has simply failed to establish her identity. The immigration judge properly rejected the identity documents offered by Petitioner, which included copies of her family's ration card, an alleged duplicate of her library card, and a copy of her driver's license. Petitioner readily admitted that these documents were not issued to her in India, but rather were procured after she had left for the United States and mailed to her by her mother. Petitioner indicated that the same agent that arranged for her illegal entry into the United States had also arranged for the procurement of these identity documents after Petitioner's departure, and testified that in India they take money and they can do anything. Thus, not only do the documents fail to establish that Petitioner is, in fact, who she claims to be, independent of the adverse credibility finding reached against her, but they are also facially suspect, particularly in light of Petitioner's Turning next to the asylum officer's notes, the immigration judge's reliance thereon was entirely appropriate in this case. Here, the asylum officer took detailed notes contemporaneously with Petitioner's interview, made those notes a part of the record before this Court, and testified before the immigration judge. Thus, this Court has the benefit of a thorough and comprehensive record of Petitioner's testimony before the immigration judge. The obvious result is that Petitioner's two sets of testimony are fraught with material inconsistencies. This Court has not required that reliable contemporaneous notes be a transcript or document every aspect of the interview before the asylum officer. Rather, the relevant inquiry is simply into whether the documents relating to the provide assurances that both the interview before the asylum officer and the testimony before the immigration judge can be compared. This Court has recognized that its inquiry ends if the immigration judge could reasonably conclude that the two sets of testimony and that the interview before the asylum officer were different. Here is substantial evidence that therefore supports the immigration judge's determination that Petitioner failed to testify credibly in support of her applications for relief. Well, how do you handle the criticism made by Mr. Job of Ms. Kauffman that she was using some partial and uncertified knowledge of Punjabi to translate dates on her own rather than wait for the translator to translate the dates? States are very important in this case because the hiding claim has different dates, right? How do you handle that? Well, first, I would note, just taking a step back, that there are indications in this record that Petitioner speaks proficient English. First, we have the immigration judge's testimony in the record interrupting Petitioner to ask whether she was. Yes, but that would be irrelevant if she's answering in Punjabi. I mean, she has the option of doing it in English or she may do it in Punjabi. If she chooses to do it in Punjabi, then we have to take her answer as it's given by the translator. Certainly. And that creates its own set of problems. So I'm not sure what the point goes to that she speaks English. I was simply trying to take a step back regarding her testimony. It would be one thing if she was – if you mean that that puts her in a position to correct the translator, but it doesn't put her in a position to correct any misimpressions that Ms. Coffman has based on her rudimentary understanding of Punjabi. It certainly wouldn't. We would simply agree with Petitioner's characterization of Ms. Coffman as not waiting for the benefit of the Punjabi translator. So Mr. Chau read you from the transcript that that's how Ms. Coffman answered. I don't think that necessarily speaks to this particular case, though. Well, how do we know that it doesn't apply to this case since she has no independent recollection of this interview and she says on cross-examination that sometimes when she hears dates, she does write down the date based on her own understanding? I would read that as an honest answer from someone who's listening. It's an honest answer. The government ought not to question it. The question is what implications do we take of that when Ms. Coffman has no independent recollection of this interview? She can't tell us. She tells us that on occasion she has done that. How can she tell us that she didn't do it in this particular case? In this particular case, we have Petitioner admitting two different sets of testimony to the both. Perhaps the most egregious inconsistency in this case is Petitioner's testimony regarding where she was between April of 1996 and March of 1997. The problem arises in the fact that Petitioner testified she was arrested in January of 1997. That's simply impossible. When confronted with that inconsistency, Petitioner admitted to the immigration judge that she had told the asylum officer that she was in hiding from April of 1996 to March of 1997 and that she had changed her testimony before the immigration judge. Therefore, that inconsistency has nothing to do with the asylum officer. Which page of the transcript are you looking at now? The relevant pages would be administrative record page 177, that's Petitioner's testimony, 288. 277. 177. 288, which is the asylum officer's testimony. 330, which is the asylum officer's notes. And 1102, which is Petitioner's supporting statement. The problem here arises in Petitioner's modification of the date on which she went to testify. Right. And where is it that she admits that she's modified it? I apologize. Just a moment. That is at administrative record page 265. 255. 265. I apologize. When confronted with that inconsistency, Petitioner acknowledged that she had told the asylum officer that she was in hiding from April of 1996 to March of 1997. So she couldn't very well have been arrested January 5th, 1997, which is what she testified to in front of the I.J. Yes, Your Honor. That's the focus of our case. And that was the incident where she was taken to the police station, beaten, and raped. Allegedly. Yes. On that ledge, that's what she testified to. She's asked the question a second time, just a couple of lines later on page 265, and the answer is no. She didn't tell the asylum officer that she went into hiding. The problem with the record before this Court is that based on Petitioner's inconsistent representations, based on her failure to offer clarification, to explain, the record simply cannot compel her to tell. Well, if you take her written statement and you take her testimony in the hearing, the dates pretty much square up. It's only when the notes get introduced that things don't square up. And we end up with mostly varying year increments. So we have January 5th, 1996 versus January 5th, 1997. So we have a discrepancy just in the year, but the dates are clear. So the testimony appears to be consistent, as the I.J. finds, between her written statement and her oral testimony. It's only when we get to the handwritten notes that we really end up with a problem. As supplemented by the asylum officer's testimony. Well, the asylum officer's testimony is not supplemented. She is basing it on what her notes are. She's interpreting her notes for us on a conversation she had years ago that she has no independent recollection of. Correct. That's a little bit tough to find clear discrepancies. I've seen these before where we have relied on the notes. And the discrepancies sometimes are grotesque. And so there's just an obvious discrepancy. That is that we have testimony of a third or a fourth arrest that doesn't show up later on, or we have a rape that doesn't appear in the final product. So somebody is clearly embellishing something. But that's not really the problem. The problem with the dates is a little bit different. I mean, that's a little bit harder for us to reconcile that. The asylum officer herself is asked about training dates, and she comes up with three different years. And then she says, yes, she can't remember which year it was. And I assume that you don't want to throw out the asylum officer's testimony on the basis of her inability to remember which year she received some training. No, not at all. I think the record before this Court must be viewed in its entirety, and the problem accrues from Petitioner's repeated inability to correct her testimony. This is not a situation in which we're simply presented with January 5th of 96 or January 5th of 97. One reading of Petitioner's testimony necessarily is inconsistent with the other. But Petitioner's testimony is not taken together with the indications that Petitioner did speak and understand English. That negates her excuse. I see that my time is running. I'd like you to tell me from the government's perspective which you think are the most serious inconsistencies in her testimony. The single most serious inconsistency is Petitioner's failure to offer any clarification or explanation as to why she testified that she was in hiding from April of 96 through March of 97, and her testimony that she was allegedly arrested in January of 97. That's egregious. It goes to the heart of her claim, and the two are necessarily incompatible and inconsistent. And the April 96 to March 97 date comes out of the officer's notes. It does, and the officer's testimony in explanation. But the officer's testimony only comes out of the notes. Correct. But as this Court has recognized where there are sufficient indications based on the record that the asylum officer's representations, as Petitioner's counsel conceded. The government did the right thing. You brought the officer in and asked her to introduce the notes. I think the government played the game according to Hoyle, but it all turns on what the notes say. And on Petitioner's inability to offer any explanation or clarification for these inconsistencies. Are you also relying on her testimony that she was beaten and raped in the first arrest at the IJ level, but she said that she was raped on the second arrest to the asylum officer? We certainly would. There are many inconsistencies in this record. We have Petitioner's inconsistent testimony. The answer, I guess, is yes. Yes, certainly. There are many more inconsistencies than simply that duration of her period in hiding. Thank you, counsel. Thank you very much. Three quick points. Because Ms. Power did immediately correct herself on page 265 of the record, the immigration judge herself did refuse to use that passage in order to justify her adverse credibility finding. That's not an issue that she relied upon. Which are you talking about? The passage on page 265, Your Honor, about when she wasn't hiding. She first said yes, she did tell the asylum officer that. And then when asked, she immediately corrected herself and said no. It was a miscommunication, obviously, in court. The second point here, the government says that the immigration judge based her adverse credibility in part on her inability to authenticate her I.D. documents. The Board of Immigration Appeals didn't affirm that aspect of the decision. If you look at the Board's decision, they only affirmed the adverse credibility finding. I may be missing something, counsel. I saw where the I.J. up front in her decision questioned the identity. I wasn't sure that at the end that that was a ground for decision. You're exactly right. She didn't use that in order to justify the adverse credibility finding, and the Board didn't affirm that aspect of her decision. Now, finally, insofar as the government saying that Ms. Power, you know, spoke English well enough to correct some of these things that happened at the asylum office, the immigration judge said the exact opposite. In her decision on page 128, she said, quote, her English may not have been as good as it needed to be in order to correct anything at the asylum office which may have been incorrect. The government's just rephrasing the immigration judge's decision in order to support its case. Okay. Thank you very much. I appreciate the argument. Power v. Mukasey is submitted. The next case is Petroleum Sales v. Valero Refining.
judges: Roth , Bybee, Bea